MENYUK, J.T.C.
Plaintiff contests defendant’s assessment of sales tax under the Sales and Use Tax Act, N.J.S.A. 54:32B-1 to -29. The principal issue is the reasonableness of the methodology employed by the defendant in its audit of plaintiff. For the reasons set forth below, I find that defendant employed an arbitrary methodology in determining that plaintiff owed additional sales tax and that plaintiff has presented sufficient evidence to overcome the presumed correctness of the defendant’s assessment and to establish that the assessment should be reduced.
The parties submitted a partial stipulation of facts, followed by a trial. Plaintiff is a New Jersey corporation whose president and sole shareholder is William McCormick. During most of the period covered by the audit, July 1, 1993 through June 30, 1997, plaintiff operated a restaurant/bar in Springfield, New Jersey. Prior to August 1, 1993, plaintiff operated the business as a nightclub or discotheque. From August to October 1993, the building in which the business operated was renovated and converted into a restaurant. The business re-opened on October 14, 1993, under the trade name “Scotty’s Steakhouse.” Mr. McCor *173 mick and his children run the restaurant business. Mr. McCormick is also the sole owner of a related entity, Scotch Associates, which holds title to the real property leased by plaintiff for its business operations.
Defendant conducted an audit of plaintiffs business and determined that additional sales and use tax in the amount of $77,606.99, plus interest and penalties, was due for the period July 1, 1993 through June 30, 1997, and additional litter control tax in the amount of $196, plus interest, was due for the period January 1, 1996 through December 31, 1996. The assessment in issue arose out of the large discrepancy in plaintiffs gross receipts as reported on the annual corporation business tax (“CBT”) returns and the amounts reported on the monthly and quarterly sales tax returns. The CBT returns consistently reported larger amounts of gross receipts than did the sales tax returns. Those discrepancies were as follows:
Gross Receipts Gross Sales (CBT)
(Sales Tax Returns) Reported for Fiscal
Reported for Year Ending February 28 Tax Year Calendar Year of Succeeding Year
1993 _$314,383 _$377,578_
1994 _$236,598_$816,382_
1995 _$439,618_$872,739_
1996 _$641,092_$872,597_
1997 $745,266 $813,328
Laurielle Nagel, William McCormick's daughter, served as plaintiffs bookkeeper beginning in 1996. Prior to that time, Mr. McCormick kept plaintiffs books and records and, for some period of time prior to 1996, there was also a part-time bookkeeper.
During the period covered by the audit, plaintiffs federal income and New Jersey corporation business tax returns and the quarterly sales tax returns were prepared by David Cohen, a certified public accountant who had been engaged by Mr. McCor *174 mick. Ms. Nagel prepared the monthly sales tax returns. Mr. Cohen came to plaintiffs business premises quarterly to prepare the quarterly sales tax returns. Ms. Nagel would provide Mr. Cohen with copies of plaintiffs books along with the amounts of sales tax that she had paid for the first two months of the quarter, and Mr. Cohen would prepare the quarterly returns for signature by Mr. McCormick or occasionally by Ms. Nagel, if her father was not available. Ms. Nagel would write a check for the amount that Mr. Cohen indicated was due. Ms. Nagel testified that the only returns that Mr. Cohen prepared at plaintiffs premises were those quarterly sales and use tax returns.
For the preparation of the corporation business tax returns, Mr. Cohen would pick up copies of plaintiffs cash receipts and cash disbursements journals and copies of its bank statements, and prepare those returns at his office. Mr. Cohen would return an original and a copy of the CBT returns by mail, with a cover letter instructing how much plaintiff owed, to whom the taxes were to be paid, and when they were due. Ms. Nagel testified that Mr. Cohen neither prepared draft returns for her review prior to finalizing them nor did he meet with her to review the return. Ms. Nagel stated that she did not review the returns prepared by Mr. Cohen, nor did she compare the CBT returns with the sales tax returns. She testified that she lacked the knowledge of what to look for. Ms. Nagel had no formal training in financial accounting or in bookkeeping and performed her duties consistent with how her father had trained her.
Mr. McCormick similarly testified that he had engaged Mr. Cohen to prepare plaintiffs tax returns at some time prior to the audit period in issue here, and that Mr. Cohen was provided with plaintiffs cash receipts and disbursements journals and plaintiffs bank statements in connection with the preparation of retux-ns. With respect to the income tax returns, Mr. McCormick confix'med that these were returned to him with instructions as to what was owed, to whom it was owed, and when to pay. He would sign the retuxms and give them to his daughter to make out the checks. Mr. McCoi’mick testified that he did not review the income tax returns with Mr. Cohen in detail, but that he would occasionally *175 ask Mr. Cohen questions regarding deductions or depreciation. With respect to the sales and use tax returns, McCormick recalled questioning use tax due on a broiler purchased from out of state which Mr. Cohen explained to him. Mr. McCormick testified that he did not compare the CBT returns with the sales and use tax returns.
Sometime in 1997, Mr. McCormick was notified by defendant that plaintiff was to be audited. He testified that he contacted Mr. Cohen and retained him to handle the audit, which was conducted at Mr. Cohen’s offices. According to both Ms. Nagel and Mr. McCormick, they provided plaintiffs business records, including bank statements, cash register tapes, and vendor invoices, to Mr. Cohen in preparation for the audit.
Mr. McCormick gave detailed testimony as to how he maintained cash register tapes during the period in issue here. He stated that he had register tapes going back to 1969 up until when plaintiff obtained a computer, which he believed was in 1998. Ms. Nagel testified that she believed plaintiff had acquired the computer in 1996. Mr. McCormick testified that he would put the tapes in a cigar box daily and at the end of the month he would bring the boxes downstairs for storage. He testified that he gave Mr. Cohen thirty-live cigar boxes filled with register tapes, which Mr. Cohen put in a liquor box and removed from the restaurant in preparation for the audit.
Matt Agbim was the defendant’s auditor who performed the audit of plaintiffs business. Mr. Agbim did not recall many of the details of the audit because of the passage of time, but confirmed that the audit had taken place in Mr. Cohen’s office. He could not recall whether he had asked Mr. Cohen for plaintiff’s cash register tapes, and could not recall whether he had requested any information that was not subsequently made available by Mr. Cohen or plaintiff. He testified, however, that any such omission would have been noted in his audit report. The audit report signed by Mr. Agbim and his supervisor stated that plaintiffs sales journal, federal income tax returns, cash disbursements journal, purchase invoices, bank statements, general ledger, and menu prices were *176 examined, but that “[n]o cash register tape was made available which is a weakness in the internal control.”
At trial, Mr. Agbim reviewed the audit workpapers that he had prepared during the audit. He explained that some of the pages of the workpapers showed his markup analysis, which is a procedure used by defendant’s auditors to estimate gross receipts of a business when its records are deemed inadequate. See Yilmaz, Inc. v. Director, Div. of Taxation, 22 N.J.Tax 204, 212 (Tax 2005), appeal pending, No. A80-05T5 (App. Div. filed Sept. 7, 2005). He testified that in the case of a restaurant business, the auditor generally selects a sample or test period and compares the cost of goods sold as developed from invoices and the records of suppliers, to the menu prices, developing a ratio of cost to selling price for the test period. The auditor arrives at an estimate of gross receipts for the audit period by applying that ratio to the cost of purchases for each year covered by the audit. Ibid.
The test or sample period selected for the audit appears to have been the calendar year 1995. Upon review of the audit workpa-pers, Mr. Agbim testified that he had determined that the plaintiffs records regarding purchases resulted in an amount that was close to the amount he had estimated based on information obtained by the Division from third party suppliers, particularly vendors of wine, liquor, and beer. It was Mr. Agbim’s testimony that he would have accepted plaintiffs purchases as reported. However, Mr. Agbim conceded that in his summary of plaintiff’s purchases, one of the numbers was a “plugged number.” He testified that, although he began a markup analysis, he was directed by his supervisor to stop doing the markup analysis before it was complete and to use the gross sales reported on plaintiffs CBT returns. In order to do this, Mr. Agbim had to develop a number for audited purchases, which, when multiplied by the markup ratio, would equal the gross receipts reported on the CBT return. He did this by adding a category to plaintiffs purchases labeled “other Visa Me” in the amount of $231,109, which, when added to other taxable purchases, resulted in total audited purchases of $383,888 for the test period. When multiplied by the markup percentages developed for beer, wine, liquor, *177 and purchases of food items, the auditor computed total gross sales of $844,813. Mr. Agbim testified that the result of using the “plugged numbers” was to increase the audited cost of goods sold, and in turn, increase the gross receipts.
Mr. Agbim testified that he did not audit the CBT returns, since he was directed to accept them as filed. Plaintiffs bank statements were made available to Mr. Agbim at the time of the audit and he prepared a summary of plaintiffs bank account deposits for the test period. He testified that he was aware that plaintiff maintained bank accounts for deposits from the proceeds of charges made to customers’ Visa, Mastercard, and, for a portion of the audit period, American Express credit cards. However, he was not aware at that time that plaintiff transferred funds from these accounts into the plaintiffs operating account. He did not look at the cash receipts and cash disbursement journals maintained by the plaintiff.
Although he had no specific recollection, Mr. Agbim testified that he must have discussed with Mr. Cohen the discrepancy between the gross receipts reported on the sales tax returns and the gross receipts reported on the CBT returns. He did not believe that he discussed the discrepancy with Mr. McCormick or Ms. Nagel.
Mr. McCormick testified that Mr. Cohen did not keep him informed of the status of the audit, and that he first learned of the outcome when Mr. Cohen visited the restaurant with two auditors from the Division of Taxation. The results of the audit were discussed with Mr. McCormick at that time and he learned that the Division had concluded that he owed more than $70,000. He testified that he did not fully understand the issues raised by the auditors. He also testified that Mr. Cohen told him that he owed something, but not as much as $70,000. Mr. Cohen told him not to worry about the results of the audit, that he (Cohen) would handle it.
On October 2, 1998, the Division issued a notice of assessment related to final audit determination, including a schedule of liabilities. Mr. Cohen prepared a letter of protest dated October 26, *178 1998 to the Division’s Conference and Appeals Branch, appealing the assessment of sales tax. According to the letter, payment for the assessment of uneontested use tax was enclosed. Ms. Nagel testified that she met with Mr. Cohen regarding the protest letter and gave him a check for the use tax payment.
The Division never received the letter. A notation on the cash disbursements journal for a check written by Ms. Nagel on October 12, 1998, payable to the Division of Taxation in the amount of the use tax assessment, $234.92, indicates that the check was never deposited. Ms. Nagel testified that when she reconciled the bank statement and noticed the discrepancy, she called Mr. Cohen to inquire and he told her not to worry about it because the State is slow to cash checks.
Ms. Nagel and Mr. McCormick learned that there was a problem when they attempted to renew plaintiffs liquor license and were not permitted to because of the unpaid taxes that are in issue here. They both testified that they unsuccessfully tried to contact Mr. Cohen several times regarding the protest of the audit. They later learned that Mr. Cohen had his own legal troubles: on March 26, 2001, he pleaded guilty to one count of second-degree theft by failure to make required disposition of property received, one count of third-degree failure to turn over taxes to the State of New Jersey, and one count of third-degree failure to file individual tax returns. As a consequence, Mr. Cohen had been incarcerated.
At some point, the accounting firm of Heffler, Radetich & Saitta took over what remained of Mr. Cohen’s accounting practice. Mr. McCormick reached a representative of that firm on one of his attempts to contact Mr. Cohen and subsequently retained Richard Fragale, a member of that firm and a certified public accountant, to pursue plaintiffs protest with the Division. Although Mr. Fragale’s first contact with the Division was beyond the time provided for protest by N.J.S.A. 54:49-18, the Division agreed to hear the protest because of the unusual circumstances surrounding Mr. Cohen’s apparent failure to send the protest letter and his subsequent incarceration. According to Ms. Nagel, plaintiff paid *179 $10,000 toward what was owed and was permitted to renew its liquor license.
Ms. Nagel testified that she was not able to provide Mr. Fragale with all of the documentation that she had provided to Mr. Cohen in connection with the original audit. According to Ms. Nagel and Mr. McCormick, although some of plaintiff’s original records were found at Mr. Cohen’s former office, the cash register tapes and some of the bank statements were never located and were never returned to plaintiff.
Ms. Nagel and Mr. McCormick testified that it was Mr. Fragale who first informed them that the source of their tax difficulties was the discrepancy between the gross receipts as shown on the sales tax returns and the gross receipts shown on the corporation business tax returns. They could not explain why Mr. Cohen had reported disparately large gross receipts on the corporation business tax returns and also on plaintiffs federal income tax returns. It was Mr. McCormick’s theory that Mr. Cohen was aware that he needed a mortgage on the real estate and that the bank would be reviewing plaintiffs income tax returns. Mr. McCormick emphatically denied, however, that he had ever asked Mr. Cohen to overstate plaintiffs gross receipts or income on the income tax returns.
In November 2000, Mr. Fragale, Mr. McCormick and Ms. Nagel met with Marianne Joralemon, a conferee in the Division’s Conference and Appeals Branch. In connection with that meeting, Mr. Fragale prepared amended CBT returns for the plaintiffs fiscal years ended February 28, 1994, 1995, 1996, and 1997. Gross income reported on the amended CBT returns, as compared with the amounts reported on the sales tax returns and original CBT returns, was as follows:
Gross Sales (CBT) Gross Sales (CBT) Gross Receipts Originally Reported Reported as Amended (Sales Tax Returns) for Fiscal Year for Fiscal Year Reported for Ending February 28 Ending February 28 Year Calendar Year of Succeeding Year of Succeeding Tax Year
1998 $314,383 $377,578 $277,551
1994 $236,598 $816,382 $221,302
*180 1995 $439,618 $872,739 $453,804
1996 $641,092 $872,597 $693,961
The amended returns reported reduced amounts of gross income and indicated that plaintiff had overpaid its CBT taxes for those years. Mr. Fragale testified that the plaintiff was not contending that it was due refunds of CBT taxes. He was aware that the statutory period for claiming a refund had expired. See N.J.S.A. 54:49-14(a) (refund claim may be filed within four years after the payment of the tax). Mr. Fragale stated that the sole purpose of preparing the amended returns was to demonstrate that the gross receipts on the original returns had been overstated.
According to Mr. Fragale, he reviewed plaintiffs books of original entry, the cash receipts and cash disbursements journals. He testified that the books appeared authentic to him because the data in them was consistent with the bank statements and with the sales tax returns. The cash receipts journal contained a column for the daily total of the receipts taken from the tapes from the two registers at the restaurant. Those daily totals were broken down into vai'ious categories, such as beer, liquor, and food, each entered in a separate column. The daily entries also included a column for sales tax, another for receipts in the form of credit charges by customers, a column for net cash receipts, and another for bank deposits. The cash disbursements journal was a record of checks written on the plaintiffs principal operating account, divided into categories of disbursements, such as for example, food purchases, liquor purchases, and rent.
Mr. Fragale asked Ms. Nagel to prepare a summary of receipts by category from the cash receipts journal, and also a summary of disbursements from the cash disbursements journal. These summaries, together with the amended tax returns, and a recalculation of the sales tax based on the gross receipts as adjusted by Mr. Fragale, provided the basis of the plaintiffs presentation to Ms. Joralemon at the conference. Mr. Fragale also testified that he provided the original cash receipts and disbursement journals for *181 Ms. Joralemon’s inspection, although he could not recall whether he had shown her the relevant pages for the entire audit period or only for the test period that had been used by the auditor. Plaintiffs presentation to Ms. Joralemon was intended to demonstrate that the plaintiffs journals supported the gross receipts as reported on the sales tax returns, and not the gross receipts reported on the CBT returns.
Mr. Fragale conceded that the amended CBT returns did not accurately reflect plaintiffs income for the years for which he had prepared returns, 1993 through 1996. He was most concerned with accurately reflecting plaintiffs gross receipts for purposes of reconciling them with the sales tax returns and reducing the sales tax assessment, and less concerned with plaintiffs expenses and other deductions.
Ms. Joralemon subsequently prepared a conference report dated January 23, 2002. As contrasted with her hand-written notes from the conference, which states the issue as being the discrepancy between gross receipts reported on the sales tax returns and those reported on the CBT returns, the conference report states the issues as being “overstated CBT returns” and “refund of CBT paid in error.” The report also noted that the taxpayer had not filed the amended CBT returns. Ms. Joralemon upheld the assessment in a final determination letter dated February 20, 2002.
Ms. Joralemon testified that she could not recall whether she had requested any other documentation from the plaintiff. She remembered seeing the summaries that Ms. Nagel had prepared from plaintiffs cash receipts and cash disbursements journals, and asking for the source of the summary. She was advised that the source was the journals. She was interested in the cash register tapes, but those were among the documents that, according to Mr. McCormick, were never returned to him. Ms. Joralemon’s handwritten notes of the meeting state “register tapes disposed of.”
On cross-examination, Ms. Joralemon admitted that she had never asked Mr. Fragale the purpose of preparing the amended CBT returns, and she declined to speculate when invited to do so. *182 Her conference report, however, evidences that she had concluded that the purpose was to claim a refund of corporation business taxes. Mr. Fragale testified that Ms. Joralemon advised him that she was unable to use the amended returns in considering the protest, because the returns had not been filed. Accordingly, Mr. McCormick signed the returns and Mr. Fragale formally filed them with the Division in early 2002, subsequent to the date of the final determination.
Plaintiff filed a timely appeal of the final determination with the Tax Court on May 15, 2002. Following the filing of the appeal, the attorneys for both parties advised the court that the Division was reviewing the audit in an effort to amicably resolve the litigation. While the effort was ultimately unsuccessful, the review undertaken by the Division was extensive, as recounted in the testimony of Mr. Agbim, Mr. Fragale, and Mare Mittleman, a supervising auditor for the Division.
Mi’. Agbim was assigned to the review together with Mr. Mittleman. At the time of the review of the plaintiffs records, Mr. Mittleman was Mr. Agbim’s supervisor and had been directed by his supervisor, Thomas Coughlin, assistant chief in field audit, to review with Mr. Agbim the schedules that had been prepared by Mr. Agbim. According to Mr. Mittleman, he and Mr. Agbim spent most of two full days at the plaintiffs premises performing the re-examination of plaintiffs records, and they also met with Mr. Fragale at his office.
In connection with the auditors’ re-examination, Mr. Fragale prepared a spreadsheet reconciling the gross receipts amounts originally reported on plaintiffs sales tax returns with plaintiffs bank deposits, taking into account inter-account transfers. The purpose of this exercise was to demonstrate to the Division’s auditors that plaintiff’s cash receipts and disbursements journals were accurate, using third party documentation, namely, the bank statements from the various accounts maintained by plaintiff during the audit period.
During the re-examination, Mr. Agbim actually performed much of the work of coordinating the deposits and credits listed on the *183 bank statements to the cash receipts and cash disbursements journals and in turn to the spreadsheet. Mr. Fragale testified that, in its final form, the spreadsheet was, effectively, a collaborative effort reflecting both his work and Mr. Agbim’s. Mr. Agbim confirmed that Mr. Fragale had fairly characterized how the spreadsheet had been produced.
During the audit period, plaintiff had maintained as many as four bank accounts, including an operating account, a payroll account, an account into which payments for Visa and MasterCard charges were electronically transferred, and, during a portion of the audit period, a similar account for payment of American Express charges. According to Ms. Nagel, cash receipts were deposited daily into the operating account, and the deposits into the credit card accounts were also swept into the operating account. Amounts were transferred from the operating account into the payroll account for payment of payroll and payroll taxes.
Plaintiff had bank statements for each of the accounts for much of the audit period, but according to Ms. Nagel and Mr. McCormick, some of the original bank statements that they had given to Mr. Cohen in connection with the original audit had never been returned to them. Notably, however, among Mr. Agbim’s workpa-pers from the original audit were a summary of deposits and credits that he had made from plaintiffs bank statements, including some apparently supplied to him at the time by Mr. Cohen, but which were now missing. Mr. Agbim and Mr. Fragale were able to use data from these bank deposit summaries in the spreadsheet reconciling the various bank accounts by eliminating the inter-account transfers from gross receipts.
At trial, Mr. Fragale was able to give a convincing demonstration that the entries in the cash receipts and cash disbursements journals corresponded with the various bank statements and that summaries of the journal entries and bank statements had also been correlated to the spreadsheet. The spreadsheet showed that the plaintiffs gross receipts had been overstated on the CBT returns prepared by Mr. Cohen. Mr. Agbim testified that, at the *184 initial audit, he had not been made aware that plaintiff transferred funds from one account to the other.
Mr. Mittleman, who supervised Mr. Agbim’s work during the re-audit, was satisfied with how the spreadsheet had been prepared and testified that any questions he had about it had been answered to his satisfaction by Mr. Fragale. He recommended to his supervisor, Mr. Coughlin, that the Division accept the taxpayer’s analysis of gross receipts as shown on the spreadsheet, which demonstrated that some of plaintiff’s receipts had been double counted because of the inter-account transfers. Mr. Agbim and Mr. Mittleman were both satisfied that the spreadsheet analysis reflected plaintiffs gross receipts, and that sales tax of $21,260.10 was due, significantly less that the $77,609.99 originally assessed.
Mr. Coughlin rejected the recommendation because the analysis did not consider that cash receipts may never have been deposited in plaintiffs accounts. He testified that it was essential to get original records such as cash register tapes, because bank statements only show what a taxpayer chooses to deposit in the bank. Mr. Coughlin believed that the amended CBT returns were inaccurate, and pointed out several inconsistencies in the expenses, such as payroll, reported on the amended CBT returns. In Mr. Coughlin’s view, the focus of the reexamination was to verify the amended CBT returns, notwithstanding that it was the sales tax assessment that had been appealed. When asked whether the purpose of the re-examination was to determine whether the original sales and use tax returns were accurate, he stated that the original audit had already determined that they were not. It was clear from his testimony that he had wholly disregarded the spreadsheet analysis based on bank deposits because there was no source documentation, such as cash register tapes to support it. Mr. Coughlin seemed to have been unaware of the original cash receipts and cash disbursements journals. In a memorandum, he referred to the disbursement journal as “reconstructed.” All of the testimony by Mr. McCormick, Ms. Nagel, and Mr. Fragale indicated that the journals were original, and, apart from the reference contained in Mr. Coughlin’s memorandum, no one in the *185 Division either at trial or in any of the documents in evidence had questioned their authenticity.
The defendant’s assessments of tax are presumed to be correct. Yilmaz, supra, 22 N.J.Tax at 231 (citing Atlantic City Tramp. Co. v. Director, Div. of Taxation, 12 N.J. 130, 146, 95 A.2d 895 (1953) (quoting Aetna Life Ins. Co. v. City of Newark, 10 N.J. 99, 105, 89 A.2d 385 (1952)); L & L Oil Sera, Inc. v. Director, Div. of Taxation, 340 N.J.Super. 173, 183, 773 A.2d 1220 (App.Div. 2001) (citing Meadowlands Basketball Assocs. v. Director, Div. of Taxation, 19 N.J.Tax 85, 90 (Tax 2000), aff'd, 340 N.J.Super. 76, 773 A.2d 1160 (App.Div.2001)); Newman v. Director, Div. of Taxation, 14 N.J.Tax 313, 318 (Tax 1994), aff'd, 15 N.J.Tax 228 (App.Div.1995); Ridolfi v. Director, Div. of Taxation, 1 N.J.Tax 198, 202-03 (Tax 1980)). The plaintiff has the burden of overcoming the presumption. Atlantic City Transp. Co., supra, 12 N.J. at 146, 95 A.2d 895; Seventeen Thirty Corp. v. Director, Div. of Taxation, 18 N.J.Tax 168, 179 (Tax 1999); Newman, supra, 14 N.J.Tax at 318.
Yilmaz, supra, held that when a taxpayer challenges an assessment by the defendant based on an audit of a cash business, the taxpayer can rebut the presumption that the assessment is correct only by “cogent evidence that must be “definite, positive and certain in quality and quantity.” 22 N.J.Tax at 236 (quoting Puntasote Co. v. City of Passaic, 100 N.J. 408, 413, 495 A.2d 1308 (1985)). The taxpayer’s evidence “must focus on the reasonableness of the underlying data used by the Director and the reasonableness of the methodology used.” Ibid, (citing Ocean Pines Ltd. v. Pt. Pleasant Bor., 112 N.J. 1, 11, 547 A.2d 691 (1988)).
In this case, Mr. Agbim, the auditor, was confronted with CBT returns and sales tax returns that reported wholly different gross receipts. This disparity warranted a close examination by the Director, who has wide latitude to make a determination regarding sales taxes that are due using one or more of several methodologies, as he sees fit.
If a return required by this act is not filed, or if a return when filed is incorrect or insufficient, the amount of tax due shall be determined by the director from such information as may be available. If necessary, the tax may be estimated on the *186 basis of external indices, such as stock on hand, purchases, rental paid, number of rooms, location, scale of rents or charges, comparable rents or charges, ... number of employees or other factors.
[N.J.S.A. 54:32B-19].
In this case, it was plain that the sales tax returns and the CBT returns could not both be correct. The auditor clearly had sufficient authority under N.J.S.A. 54:32B-19 to use the markup method to determine whether the plaintiff had underreported its gross receipts on the sales tax returns. There was, however, no authority for the defendant to adopt the gross receipts as reported on the CBT returns rather than the gross receipts as reported on the sales tax returns merely because it was more convenient to do so or because the use of the gross receipts reported on the CBT return produced a large sales tax liability.
In this case, Mr. Agbim testified that he had begun a markup analysis, and his workpapers indicate that he had established markup ratios for various categories of food and beverages served by the plaintiff. It was also his testimony that he had been directed to stop that analysis, and conform gross receipts for sales tax purposes with the gross receipts as reported on the CBT returns. In order to do so, he increased the purchases made by the plaintiff by an arbitrary amount which, when multiplied by the markup ratio, produced estimated gross receipts conforming with those reported on the CBT return. That methodology is aberrant and not merely imperfect. See Yilmaz, supra, 22 N.J.Tax at 236. I conclude that plaintiff has overcome the presumption of correctness of the original assessment.
I also conclude that plaintiff has established that its sales tax deficiency was in the amount of $21,260.10. That is the amount that Mr. Agbim concluded was correct after reviewing and revising the spreadsheet originally prepared by Mr. Fragale. Mr. Mittleman, Mr. Agbim’s supervisor, also concurred in that amount. As noted above, Mr. Fragale convincingly demonstrated that the spreadsheet tied in to the entries contained in the plaintiffs cash receipts and cash disbursements journals, as well as to the bank statements.
*187 Mr. Coughlin’s principal criticism of the methodology employed by Mr. Fragale, Mr. Agbim, and Mr. Mittleman was that plaintiff lacked any cash register tapes through which plaintiffs receipts could be verified. His concern was that taxpayers do not necessarily deposit all of their receipts in the bank, and that the spreadsheet constructed by Mr. Fragale and Mr. Agbim was essentially an analysis of bank account deposits.
Mr. Coughlin is correct to a point. N.J.S.A. 54:32B-16 requires vendors to keep records of every purchase in a form that the Director may, by regulation, require. “Such records shall include a true copy of each sales slip, invoice, receipt, statement or memorandum” showing the amount of separately stated tax. Ibid. The Director has promulgated two regulations that are pertinent here. N.J.A.C. 18:24-2.3(a) provides:
A true copy of all sales slips, invoices, receipts, statements, memoranda of price, or cash register tapes, issued to any customer by a vendor who is required to be registered pursuant to the provisions of the Sales and Use Tax Act (N.J.S.A. 5A:32B-1 et seq.) and records of every purchase and purchase for lease must be available for inspection and examination at any time upon demand by the Director, Division of Taxation, or his or her duly authorized agent or employee and shall be preserved for a period of four years from the filing date of the quarterly period for the filing of sales tax returns to which such records pertain.
N.J.A.C. 18:24-2.4(a) provides, however, that when a taxpayer maintains summary records showing total receipts and taxable receipts, the taxpayer may dispose of individual sales slips, invoices, receipts, statements, memoranda of price or cash register tapes. Plaintiffs cash receipts and cash disbursements journals are such summary records. Under the Director’s regulations, plaintiffs records were adequate.
Cash register tapes are source documents that enable the Division to spot check the accuracy of the summary records. In other words, although not absolutely required by the regulations if summary records are available, cash register tapes are helpful, and if an auditor has reason to believe that a taxpayer’s summary records are inaccurate, and no cash register tapes are available, the use of a markup analysis is appropriate. N.J.S.A. 54:32B-19. In this case, the accuracy of plaintiff’s records was in question due to the difference in gross receipts reported on the sales tax and *188 the CBT returns. The evidence demonstrates that Mr. Cohen never gave Mr. Agbim the cash register tapes at the original audit. Although I find Mr. McCormick’s testimony regarding the transfer of the tapes to Mr. Cohen to be credible, Mr. Agbim’s audit report clearly states that no cash register tapes were made available to him, and notes that the lack of such tapes were a weakness in internal controls. Had Mr. Agbim been permitted by his superior to complete his markup analysis, it would have been difficult to find fault with the defendant’s methodology.
For the foregoing reasons, I conclude that plaintiffs sales tax liability for the audit period in question is $21,260.10, plus interest and applicable penalties. Pursuant to R. 8:9-3, counsel are directed to submit computations of the amount due within thirty days of the date of this opinion. Such computations shall take into account any payments made by the plaintiff. If the parties are unable to agree as to the amount of the remaining deficiency, the parties shall each submit proposed computations to the court pursuant to R. 8:9-4.