NOT FOR PUBLICATION WITHOUT APPROVAL OF
THE TAX COURT COMMITTEE ON OPINIONS

_____
                          :

CHARLEY O'S, INC.,            :        TAX COURT OF NEW JERSEY
                          :        DOCKET NO: 002178-2016

                Plaintiff,    :

                          :

    vs.                  :

                          :

DIRECTOR,                   :
DIVISION OF TAXATION,    :

                          :

               Defendant.    :

_____:

Decided: June 13, 2019.

Joel Clymer for Plaintiff (Obermeyer Rebmann Maxwell & Hippel LLP for Plaintiff, attorneys) (Matthew A. Green, Esquire and Joel Clymer, Esquire on the brief).

Heather Lynn Anderson for Defendant (Gurbir S. Grewal, Attorney General of New Jersey, attorney).

**CIMINO, J.T.C.**

## I.    <u>INTRODUCTION</u>

Plaintiff taxpayer, Charley O's, Inc., filed a complaint with this court appealing the additional tax, interest, and penalties assessed on it by defendant, Director, Division of Taxation, in the amount of $294,145.01 for the years 2009 through 2012. The Director's auditor used the indirect mark-on method to arrive at his assessment amount. Here, the Director submits a motion for summary judgment.

The Director argues that there are no material issues genuinely in dispute, making this matter ripe for summary judgment. Essentially, the Director maintains that any issue raised by taxpayer about the auditor's methods or data used in his assessment, even when granting all reasonable inferences to taxpayer, fail to overcome the presumption of correctness to be afforded to the Director. If the Director's motion succeeds and he is granted summary judgment, the assessment of the auditor would stand.

Taxpayer argues that there are material issues genuinely in dispute in this case. Specifically, it claims that the Director's auditor, among other things, failed to use proper serving sizes offered by taxpayer, wrongfully considered purchases not in fact made by taxpayer, and overstated taxpayer's income from hosting comedy events. Correcting for these adjustments, taxpayer claims that the director's mark-on should be reduced by about twenty percent, and that taxpayer's total sales should be further reduced based on the auditor's incorrect estimations. If taxpayer succeeds and the Director's motion is denied, the matter will be set down for trial.

## II.  FACTUAL SUMMARY

Taxpayer is a restaurant trading as Scotty's Pub in Springfield, New Jersey. Taxpayer was audited by the Director for years 2009 through 2012. After initial communications with taxpayer, the Director's auditor determined that taxpayer had inadequate books and records to conduct the audit, so he resorted to using the mark-

on method. By using the mark-on method, the auditor extrapolates sales based upon a comprehensive review of a sample period which is then applied to the entire audit period.[1] Here, the director's auditor used October 2012 as the sample period.

The auditor first determined taxpayer's purchases for the sample period, primarily using purchase invoices provided by the taxpayer. Then, utilizing a menu obtained from taxpayer and personally estimated serving portion sizes, the auditor determined the expected income from each item purchased by taxpayer during the sample period. Dividing the expected income by the taxpayer's purchases, the auditor determined separate mark-on ratios for food, beer, wine and liquor, and soft drinks.

After the auditor determined a mark-on for each category during the sample period, he weighted the purchases for each category based upon taxpayer's purchases for fiscal tax year 2009 (from March 1, 2009 to February 28, 2010), adjusted for spoilage, and reached an average mark-on ratio of 2.95. After reviewing taxpayer's purchase records for tax years 2009 and 2010 and being satisfied same

---

[1] "For example, if the taxpayer purchased twelve bottles of beer at a cost of one dollar each, and sold each bottle for a price of two dollars, the [mark-on] would be computed as total sales of that product, or $ 24, divided by cost, or $ 12, and the [mark-on] would equal 2.0." Yilmaz, Inc. v. Dir., Div. of Tax'n, 22 N.J. Tax 204, 212 (Tax 2005). This mark-on could then be multiplied by the total number of bottles of beer purchased by the taxpayer during a specific period to determine the estimated income during that period. Ibid.

were complete after making some adjustments[2], the auditor then multiplied the mark-on value by plaintiff's total purchases to determine taxpayer's total food sales in 2009 and 2010. For tax year 2011 the auditor was not satisfied that taxpayer's purchase records were complete. However, the auditor possessed third-party records of taxpayer's alcohol purchases from 2011. The auditor calculated the average ratio of alcohol to total purchases from 2009 and 2010. He then applied this ratio to taxpayer's 2011 alcohol purchases to estimate taxpayer's total restaurant purchases for 2011.[3] Because the auditor possessed no tax records from taxpayer for 2012, he applied the calculated purchases from 2011 to 2012 as well.[4] The auditor then added his estimation of taxpayer's sales relating to its comedy events. After adjusting his calculations from fiscal years to tax calendar years, the auditor determined that

---

[2] The auditor added $27,300 to each year for bread and produce purchases. This adjustment is discussed in further detail infra at 13.

[3] More typically, to determine taxpayer's purchases, an auditor determines a ratio of reported to audited purchases for a sample period, then applies that ratio to a taxpayer's reported purchases for the entire audit period. See Yilmaz, 22 N.J. Tax at 218-19. For purposes of this motion, the court accepts the auditor's methodology in reaching taxpayer's purchases for 2011 and 2012. However, it must be noted that the auditor's use of an alcohol to total purchases ratio plainly assumes, without corroborating proof, that taxpayer's non-alcohol purchases increase or decrease at the same rate as its alcohol purchases, and that taxpayer's purchases remained the same in 2012 as in 2011. Moreover, the ratio factors in a contended additional purchase value for bread and produce, as discussed in more detail infra at 13.

[4] For the part of fiscal tax year 2008 under audit (from January 1, 2009 to February 28, 2009), the auditor accepted taxpayer's reported purchases.

taxpayer had gross sales for the audit period of $3,787,563.19. Multiplying that by the applicable sales tax rate, the auditor determined that the total sales tax due was $265,129.42. Subtracting the $148,779.70 that taxpayer had already remitted in sales tax for the audit period, the auditor determined that the remaining sales tax liability for taxpayer was $116,349.72. The auditor calculated an additional amount due of $37,747.18 in interest and $58,174.87 in penalty for a total sales tax liability of $212,271.79.

Based on the additional audited sales, the auditor also assessed $65,309.46 in additional CBT due, with $13,298.29 in interest and a penalty of $3,265.47 to total $81,873.22. Combining this with taxpayer's sales tax liability, the auditor determined an additional assessment on taxpayer for the audit period in the grand total amount of $294,145.01.

III.   **LEGAL CONCLUSIONS**

"If a [required return] is not filed, or if a return when filed is incorrect or insufficient, the amount of tax due shall be determined by the director from such information as may be available. If necessary, the tax may be estimated on the basis of external indices, such as stock on hand, purchases, . . . location, scale of . . . charges, comparable . . . charges, type of . . . service, number of employees or other factors." N.J.S.A. 54:32B-19. In other words, the Director is given broad discretion in reaching the amount of tax which is due and owing. This information may be

obtained "from the seller or from any other source." N.J.A.C. 18:24-2.15(b). Likewise, "[i]t is a well established principle, that where the records are deemed insufficient, 'the Director is given broad authority to determine the tax from any available information and, if necessary, to estimate the tax from external indices.'" Coliseum Pizzeria, Inc. v. Dir., Div. of Tax'n, 24 N.J. Tax 369, 357 (Tax 2008) (quoting Yilmaz Inc. v. Dir., Div. of Tax'n, 390 N.J. Super. 435, 441, 23 N.J. Tax 361, 366, 915 A.2d 1069 (App. Div. 2007)).

To that end, "the Director's assessments of tax are presumed to be correct and the plaintiff has the burden of overcoming the presumption." Yilmaz, 390 N.J. Super. at 440, 23 N.J. Tax at 366. It has long been held that a mere naked assertion by taxpayer is insufficient to rebut the presumption. Ridolfi v. Dir., Div. of Tax'n, 1 N.J. Tax 198, 202-03 (Tax 1980). See also Yilmaz, 390 N.J. Super at 440, 23 N.J. Tax at 366.

To strike a balance between the Director's and taxpayer's rights, the government, in dealing with the taxpaying public, must turn square corners. F.M.C. Stores, Co. v. Borough of Morris Plains, 100 N.J. 418, 426, 495 A.2d 1313 (1985). In the context of sales tax audits, such as the one before the court, this means that "the absence of adequate tax records does not give the [Director] carte blanche to impose Draconian absolutes." Duncan Truck Stop, Inc. v. Dir., Div. of Tax'n, 4 N.J. Tax 367, 377 (Tax 1982). An entity's fair share of taxes is required, no more or less,

- 6 -

regardless of the condition of their books and records or their attempts to evade taxes. A wildly incorrect assessment could become a de facto penalty on the taxpayer, but only the Legislature has the authority to authorize a tax penalty. See, e.g., N.J.S.A. 54:49-4(a) (underpayment penalty of five percent); N.J.S.A. 54:53-18, -19, -20 (failure to utilize amnesty penalty of five percent); N.J.S.A. 54:49-9.1 (civil fraud penalty of fifty percent).

On the other hand, the taxpayer cannot expect an assessment to be exact, when it is the taxpayer who has failed to provide the necessary records. An audit which is merely imperfect is acceptable so long as it is not aberrant. Yilmaz, 390 N.J. Super. at 442, 23 N.J. Tax at 368 (citing Charley O's Inc. t/a Scotty's Steakhouse v. Dir., Div. of Tax'n, 23 N.J. Tax 171, 186 (Tax 2006)). Again, a naked assertion by the taxpayer without support is insufficient to rebut an audit determination. Yilmaz, 390 N.J. Super. at 440, 23 N.J. Tax at 366. The taxpayer needs to either set forth a particularized issue concerning the data utilized or the soundness of the reconstruction methodology. Coliseum Pizzeria, 24 N.J. Tax at 376. Such a challenge must consist of evidence that is definite, positive and certain in quality and quantity. Yilmaz, 390 N.J. Super. at 440, 23 N.J. Tax at 366.

As summarized by the Appellate Division, there must be evidence that the amount of the assessment is far wide of the mark for the taxpayer to overcome the presumption. Yilmaz, 390 N.J. Super. at 441, 23 N.J. Tax at 366. The Director does

not have to establish that he used the best possible method to estimate the taxpayer's receipts, when it was the taxpayer's failure to comply with the statutory mandate of maintaining adequate records that forced the Director to resort to the mark-on method in the first place. Yilmaz, 22 N.J. Tax at 235-36. The Director has wide latitude in fulfilling this mandate. Id. at 235.

This case comes before the court on defendant's motion for summary judgment. The New Jersey Supreme Court has held that summary judgment provides "a prompt, businesslike and inexpensive method of disposing of any cause which a discriminating search of the merits in the pleadings, depositions and admissions on file, together with the affidavits submitted on the motion clearly shows not to present any genuine issue of material fact requiring disposition at trial." Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 530 (1995).

To begin the analysis, the court addresses taxpayer's general claims that the Director's methodology and data used were aberrant. The court first acknowledges that the auditor's use of the mark-on method was reasonable in this instance. The Director claims that of all the documents it requested from taxpayer to conduct his audit, he received a number of items, including general ledgers for 2008 through 2011, adjusted trial balances for 2008 through 2011, bank statements for 2008 through 2011, check stubs for 2009, purchase invoices for 2009 and 2010, payroll summaries, W-2s and W-3s for 2010 through 2012, a list of employees with job titles

and hours worked, partial purchase invoices for the fourth quarter of 2012, drink prices and portion sizes for food on taxpayer's menu. On the other hand, the Director claims that taxpayer failed to provide cash register tapes or daily summaries, a depreciation schedule and original asset invoices for 2009 through 2012, complete purchase invoices for the fourth quarter of 2012, and credit card statements for 2009 and the fourth quarter of 2012. From the documents he did receive, the Director claims the information was incomplete or contained blatant errors, reducing its reliability. For instance, the Director claims that taxpayer's reported liquor purchases exceeded its total purchases as reported on its CBT returns for tax years 2009 through 2011.

In response, taxpayer claims that it had provided summary handwritten sales journals that obviated the need for an indirect mark-on analysis. Additionally, taxpayer claims that during its previous audit it provided the Director with cash register receipts from February of 2010 which could have been used to corroborate the information recorded in taxpayer's summary handwritten sales journals. The Director refutes this, maintaining that it never had possession of such register tapes during the current audit, and that ultimately the taxpayer, not the Director, has a responsibility to retain such cash register receipts.

It must be remembered that the director "has wide latitude to make a determination regarding sales taxes that are due using one or more of several

methodologies, as he sees fit." Charley O's, Inc. v. Dir., Div. of Tax'n, 23 N.J. Tax 171, 185 (Tax 2006). Here, the auditor determined that taxpayer's books and records were inadequate. Taxpayer had plain discrepancies in its reported purchases, and clearly was missing records which may have allowed the auditor to use a different method to evaluate taxpayer's liability. Instead, in his expertise, the auditor determined that the mark-on method would provide the most accurate value of gross sales during taxpayer's audit period. "[I]t is contrary to the purpose of N.J.S.A. 54:32B-16 to require the Director to establish that he used the best possible method to estimate the taxpayer's receipts, where it is the taxpayer's failure to comply with the statute that forced the Director to resort to the markup method in the first place. . . . An aberrant methodology will overcome the presumption of correctness. An imperfect methodology will not." Yilmaz, Inc., 22 N.J. Tax at 235-36 (citations omitted). The court finds that the auditor's use of the mark-on method in this instance was reasonable.

Taxpayer additionally takes issue with the accuracy of various data used by the auditor. First, it challenges the auditor's estimation of serving size portions. In his report, the auditor states "[t]axpayer provided portion sizes, but could not prove portion sizes. Based on my visit to the restaurant and my supervisor's two visits to the restaurant, reasonable estimates were made for portion sizes." Yet taxpayer claims numerous instances where the auditor's estimated portion sizes are

significantly smaller than taxpayer's actual portion sizes, sometimes as little as one-third. This is a credibility determination. On summary judgment all reasonable inferences of fact are in favor of the non-moving party, in this case the taxpayer. Brill, 142 N.J. at 536. However, the Director's audit is entitled to a presumption of correctness. While the evidence is viewed with all inferences in taxpayer's favor, the taxpayer must still establish that the presumption can be overcome with evidence that is definite, positive and certain in quality and quantity.

As certified by Laurielle Nagel, daughter of taxpayer's sole shareholder and responsible for operation and accounting for the establishment, taxpayer takes issue with the auditor's estimated portion sizes as follows by claiming:

- The serving size for wine by the glass was eight ounces, and not four ounces;
- The serving size for wine by the carafe was thirty-six ounces, and not twelve ounces;
- The serving size for chicken breast entree was fourteen ounces, and not eight ounces;
- The serving size for chicken breast sandwich was ten ounces, and not eight ounces;
- The serving size for crab cake sandwich was six ounces, and not three ounces;
- The serving size for twin crab cake was twelve ounces, and not six ounces;
- The serving size for french fries was sixteen ounces, and not six ounces;
- The serving size for a full rack of ribs was forty-eight ounces, and not sixteen ounces;
- The serving size for a half rack of ribs was twenty-four ounces, and not eight ounces;
- The serving size for salmon and fish was twelve and ten ounces, and not eight and six ounces;

- 11 -

- Taxpayer serves free refills of soft drinks and coffee;
- The serving size for soft drinks was sixteen ounces, and not eight ounces;
- The soft drink pitchers taxpayer used were sixty-four ounces, and not forty-eight ounces.

Overall, larger portion sizes lead to a lower profit margin, or mark-on ratio for taxpayer. For example, the auditor determined that taxpayer's half rack of ribs was an eight ounce portion, while taxpayer claims that its half rack of ribs were a twenty-four ounce portion. This changes the projected sales of a half rack of ribs during the sample period from $401.76 to $133.92, and therefore accounts for a change in the individual mark-on for the item from 10.94 to 3.65. In turn, this reduces the food mark-on during the sample period from 3.34 to 3.25, which decreases the total audited gross sales by $10,212.94, and decreases the total mark-on for the sample period from 2.95 to 2.91. Extrapolating this over the total audit period, taxpayer's grand total audited sales decrease from $3,787,563.19 to $3,745,272.07, a difference of $42,291.12, and thereby decrease taxpayer's sales tax liability by $2,960.38. This change in liability does not take into account the effect such a decrease in audited gross sales would have on interest, penalty, and additional CBT due.

Taking into account all of taxpayer's portion size adjustments, taxpayer's audited sales over the one-month sample period is reduced by $1,387.28 for food, $2,878.20 for soft drinks, and $1,892.25 for wine and liquor. This results in mark-on ratios, before allowance for spoilage of ten percent, of 2.86 for food, 2.41 for

wine and liquor, and 9.42 for soft drinks.  Beer remains unchanged at 3.59. Weighing all of the categorical mark-on values based upon yearly sales and adjusting for spoilage yields an average mark-on value of 2.65.

Based upon audited purchases, this mark-on adjustment alone reduces the sales tax for the audit period to $240,548.59, or $24,581.12 less than the auditor's assessment.  This would reduce taxpayer's sales tax liability from $116,349.72 to $91,768.60.  These issues of fact materially affect the mark-on value, and therefore the tax assessment, given to taxpayer.

Taxpayer also challenges the auditor adding $27,300.00 to taxpayer's reported food purchases for fiscal years 2009 and 2010.  The Director asserts "[f]or fiscal years [2009 and 2010], I noticed that there were no invoices for produce or bread and increased audited purchases by $525.00 per week [or $27,300.00 per annum] to account for any missing bread/produce invoices."  Taxpayer states that it made its bread in-house as opposed to buying bread from third-party vendors.  Moreover, the record references purchases from Pocono Produce Company.  Whether produce was actually purchased from Pocono Produce is unclear from the record.  Using a mark-on of 2.66[5], the difference in food purchases of $27,300.00 in both 2009 and 2010

---

[5] The adjusted mark-on of 2.65 noted above changes slightly to 2.66 due to the removal of the auditor's added bread and produce purchases.

creates a $141,336.47 sales discrepancy, or a decrease in sales tax of up to $9,893.55.[6]

Regarding taxpayer's comedy events, the court finds that substantive issues of material fact exist as to when taxpayer conducted comedy nights, the amount of patrons at the comedy nights, and the price for which patrons attended the comedy nights. First, the Director claims that taxpayer held comedy nights on Tuesdays, Fridays, and Saturdays, at approximately fifty percent capacity, or thirty-nine patrons per show, with patrons paying $12.00 to attend, amounting to $72,072.00 in sales per year. Extrapolating this through the audit period, the Director claims that comedy sales account for $20,180.16 in additional sales tax owed by taxpayer.

The Director presents posters advertising comedy nights on Tuesday, December 3, and Tuesday, December 17 (December 3 and December 17 fell on a Tuesday most recently in 2013 and 2002). Taxpayer presents its December 2013 calendar which shows no events scheduled on either December 3 or December 17. It claims that various promotors used its comedy venue during week-nights. According to taxpayer, during these events it would only reap the benefit of

---

[6] Moreover, as mentioned supra at 4, removing the additional $27,300.00 in food purchases in 2009 and 2010 also changes the ratio of alcohol to total purchases that the auditor used to determine taxpayer's total purchases in 2011 and 2012. By removing the $54,600.00, the ratio changes from 59.42% to 65.69%. In turn, this decreases taxpayer's total sales in 2011 and 2012 by $135,397 and its tax liability by $9,478.

increased customer traffic to its restaurant and would collect no revenue from the actual comedy event.

Taxpayer also estimates fifty-eight patrons per week attended its comedy events, and many patrons had vouchers and discounted tickets, amounting to only $22,080.00 in sales per year. Again extrapolating out, taxpayer essentially claims that the maximum amount of sales tax that it owes based on its comedy events is only $6,182.40 as compared to the $20,186.16 determined by the auditor. At no point does the auditor claim to have visited taxpayer's comedy nights or observed their attendance size. This does not mean that at trial the court is compelled to accept taxpayer's attendance figures. That remains a credibility issue which is not amenable to resolution on summary judgment.

The court finds that, at the very least, the difference in food portion sizes, purchases, and revenue from its comedy events, giving all reasonable inferences to taxpayer, constitute material issues of fact that require the denial of the Director's motion for summary judgment. Taxpayer's contentions as to portion sizes, bread and produce purchases and comedy club attendance will be subject to a credibility assessment at trial. If taxpayer's testimony is not credible, then the court may be

free to utilize the estimates contained in the audit.[7] If found to be credible, some adjustment to the amount sought by the Director may be in order.

Lastly, the court notes that some of taxpayer's arguments for its decreased mark-on are clearly incorrect. For instance, taxpayer argues that its audited sales should be reduced because the advertised selling price of its alcohol included sales tax.[8] However, the receipts provided to the court by both taxpayer and the Director clearly show that alcohol sales were taxed separately and in addition to the advertised price. For example, a receipt from February 8, 2010 at 9:24 p.m., located in the record, accounts for a purchase of two beers totaling $7.00, with a tax of $0.49 added, resulting in a total charge of $7.49.

## IV. CONCLUSION

In sum, taxpayer here presents factual arguments with varying levels of substance. However, giving all reasonable inferences to taxpayer as to the issues of material fact, the taxpayer has set forth sufficient particularized issues concerning the data utilized that could overcome the Director's presumption of correctness at trial. Therefore, there is sufficient reason to set this matter down for trial to resolve

---

[7] It is worth noting that the court may deny an undisputed position if the testimony or evidence given is not credible. Johnson v. Salem Corp., 189 N.J. Super. 50, 53-54 (App. Div. 1983).

[8] Taxpayer clarifies in its brief: "if the advertised price of a bottle of beer is [$4.00], the price includes $3.74 of sales and [$0.26] of sales tax."

the factual disputes as to the underlying data of the Director's audit. For these reasons, the Director's motion for summary judgment is denied.