NOT FOR PUBLICATION WITHOUT APPROVAL OF
THE TAX COURT COMMITTEE ON OPINIONS

_____
                                :
STATEWIDE COMMERCIAL CLEANING, : TAX COURT OF NEW JERSEY
LLC,                            :
            Plaintiff,          : DOCKET NO:  003504-2015
                                :
            vs.                 :
                                :
DIRECTOR, DIVISION OF           :
TAXATION,                       :
            Defendant.          :
_____:

Decided: October 20, 2017

Scott E. Becker, attorney for plaintiff

Steven J. Colby for defendant (Christopher S. Porrino, Attorney General of New Jersey, attorney)

**CIMINO, J.T.C.**

## I.  **FACTUAL SUMMARY.**

The taxpayer, Statewide Commercial Cleaning, LLC, is in the business of providing cleaning and restoration services to properties that have suffered damages as a result of some sort of casualty.  The Director scheduled an audit of taxpayer's books to determine if additional sales and use tax would be due and owing for the period of January 1, 2007 through December 31, 2010.  The parties agreed that the year 2009 would be the sample period for the audit.  A written sampling agreement does not appear to have been prepared.  From the sample period, the auditor would

-1-

extrapolate any unpaid tax over the entire audit period. Based upon the audit report of July 8, 2013, the Director's auditor determined that the records were adequate to properly conduct the audit.

The audit consisted of two general areas which were designated by the auditor as "use tax" and "sales tax". As to the "use tax" portion of the audit, the auditor examined whether the taxpayer properly and sufficiently paid tax on purchases from vendors. As to the "sales tax" portion of the audit, the auditor examined whether the taxpayer properly and sufficiently collected tax on sales to customers of the taxpayer.

The portion of the audit delineated as a "use tax" audit focuses upon purchases from vendors of the taxpayer for which taxes were not paid. To conduct this audit, the auditor listed certain vendors in alphabetical order for 2009 along with the identifying information such as the invoice number, date and purchase amount. For each invoice in question, the auditor then listed the amount upon which tax was not paid, but purportedly due, as a taxable exception.

It appears that initially the auditor's spreadsheet listed all vendor invoices in question for which tax was not paid. Then during the course of the audit, certain invoices were deemed exempt (i.e., school projects, etc.). The invoices that remained as taxable exceptions were listed and totaled. These invoices totaled

$72,832.46 and were divided by the total expenses of $3,481,561.00 for 2009 yielding a tax payment shortfall percentage of 2.09195%. Over the audit period from 2007 to 2010, there were total expenses of $16,462,054.00. Multiplying these taxable expenses by the tax payment shortfall percentage extrapolates a total taxable invoice shortfall amount of $344,377.68. Multiplying this by the tax rate of 7% results in the total "use tax" due on expenses of $24,106.44.

Taxpayer challenges a number of the purported taxable vendor expenses as being tax exempt since the ultimate consumer was an exempt governmental entity such as a school. See N.J.S.A. 54:32B-9. Upon review of the description that is provided on the auditor's spreadsheet, a number of invoices had notations in the description field that indicated schools or other public entities. It was unclear whether the description entries were gathered from the taxpayer's accountant, the taxpayer's business records, or a determination made by the auditor.

To calculate the "sales tax" portion of the audit, the auditor listed the name of each customer alphabetically along with identifying information such as the invoice date and number. The auditor also listed the total invoice amount as well as the amount of sales which were exempt from taxation for reasons such as a capital improvement. See N.J.S.A. 54:32B-3(b)(4). Of note, the auditor also had a column delineated as "audited taxable exceptions" which consisted of invoice sales amounts upon which

-3-

tax was not paid, but the auditor was of the opinion that tax should have been paid. The auditor divided the "audited taxable exceptions" (those invoices upon which a tax should have been paid but was not) by the total sales (exceptions or not) to come up with a percentage rate by which the taxpayer allegedly underreported the tax due and owing. For the 2009 sample year, the total sales calculated by the auditor was $2,735,265.00. The total exceptions for which tax should have been paid, but was not, amounted to $95,432.58. This resulted in a shortfall percentage of 3.49%.

The auditor then took the total sales for each year from 2007 through 2010 and multiplied by the tax collection shortfall percentage of 3.49%. The auditor found that the total sales from 2007 to 2010 were $14,063,878.00. This amount was multiplied by 3.49% resulting in a total taxable sales shortfall of $490,829.00. Multiplying that amount by 7% results in additional sales tax due of $34,358.03.

Of the $96,432.58 in taxable exceptions from the 2009 sample year, the sum of $55,683.44 consists of invoices from Barefoot Landing, the familial shore home of the principal of taxpayer located in Ocean City, New Jersey. The allegation is that the property suffered significant damage from unruly tenants that required significant restoration, repair and remodeling. The Director argues that the work done to Barefoot Landing did not

constitute a capital improvement and is thus, taxable. The taxpayer argues to the contrary. The dispute here is not so much whether the transaction is taxable in the amount of some $3,897.84,[1] but rather, whether it should be used to calculate the percentage of audited taxable exceptions that are carried over to other years. The taxpayer argues that the Barefoot Landing expense was simply a one-time event that happened in 2009 and did not repeat itself for the other years of the audit. The taxpayer alleges this issue has been raised prior to the Final Audit Determination. Thus, the shortfall percentage which was extrapolated to the other years must be recalculated which would result in a significant decrease in taxes.

As a result of the audit, the Director issued a Notice of Assessment Related to Final Audit Determination on July 25, 2013. The Schedule of Liabilities attached to the Notice of Assessment and also dated July 25, 2013 indicates the tax type "S & U" for the period of January, 2007, through December, 2010, with a tax liability of $58,464.47. The notes section of the Schedule of Liabilities indicates "S & U" means "Sales and Use Tax." A subsequent page which is labeled "Sales and Use Tax" breaks down the asserted deficiency as comprised of sales tax of $34,358.03 and use tax of $24,106.44. With the addition of penalties and

---

[1] $55,683.44 multiplied 7% tax rate yields $3,897.84.

interest, the total amount sought was $84,142.64. A third sheet which was a quarter-by-quarter calculation of the amount due for 2007 through 2010 lists the tax as an identical amount of $3,654.00 for each quarter.

On August 8, 2013, the accountant for the taxpayer sent a letter indicating "[t]hrough the advice of [counsel], we will continue to process the paperwork necessary to begin to [sic] appeal process. Please call me at your earliest convenience to continue to work towards a resolution." On December 19, 2013, the accountant sent a follow-up email. The email from the accountant indicates that he has attached the documents provided previously.

A response to this email was provided two months later on February 10, 2014 indicating that if the taxpayer desired to protest the audit, he had to submit a power of attorney "within the next 30 days" or the Director "will consider the matter closed." Moreover, the email indicated that "[i]n order to perfect your request in accordance with N.J.A.C. 18:1.1.8 [sic] and N.J.S.A. 54:49-18 the item(s) listed below are REQUIRED and must be submitted. . ." (emphasis added). The email then listed eight different submissions detailing the protest to be provided. The email went on to indicate, "NOTE: Failure to submit this information along with a copy of this letter within thirty (30) days of the date of this letter can jeopardize your conference rights and render your request null and void."

On April 21, 2014, the Division sent written correspondence to taxpayer's accountant indicating the information requested in the email on February 10, 2014 was not provided. The Division then reiterated the list of requested submissions as set forth in the February 10, 2014 email. The Division further indicated that, "NOTE: Failure to submit the information along with a copy of this letter within Fifteen (15) days of the date of this letter can jeopardize your conference rights and render your request null and void."

Thereafter, on April 28, 2014, the accountant responded that the tax being protested is the years 2008 through 2011 and the protest is based upon the fact that the test year includes a construction project not subject to "sales tax." The taxpayer provided further correspondence by way of telefax on November 5, 2014 pointing out issues with the "use" tax portion of the audit.

A conference report was prepared on December 17, 2014 indicating that a conference hearing occurred telephonically on September 18, 2014. However, the conferee ruled that the only type of tax being protested is the "sales" tax for the period in question and that the taxpayer is out of the time to protest the "use" tax liability. At the beginning of the report, the conferee indicates tax type as "sales" for the period ending December 2010 with a total tax liability of $58,464.47. In the final section of the report under the title "Assessment Adjustment," the tax

type is once again listed as just "sales" and the total tax liability is $58,464.47. Notably, this is identical to the total "sales and use" tax assessment of $58,464.47 noted in the Schedule of Liabilities attached to the Notice of Assessment of July 25, 2003. As to the "sales" tax portion, the conferee determined that the taxpayer failed to substantiate the Barefoot Landing transactions are extraordinary for the entire audit period and the transactions did not constitute a non-taxable capital improvement.

Thereafter, the taxpayer timely filed an appeal with the New Jersey Tax Court. The Director has now brought a motion for summary judgment.

## II. CONCLUSIONS OF LAW.

### A. Appeal Limitations.

When a taxpayer receives a notice of assessment or finding, the taxpayer has two and possibly three remedies. First, the taxpayer may "file a protest in writing. . . and may request a hearing." N.J.S.A. 54:49-18(a). In addition, a taxpayer can forego this informal conference and file an appeal directly with the Tax Court. N.J.S.A. 54:51A-13; see also N.J.S.A. 54:32B-21(a). In either case, the filing must be within 90 days after the action sought to be reviewed. N.J.S.A. 54:49-18(a); N.J.S.A. 54:51A-14(a); N.J.S.A. 54:32B-21(a). In the alternative, a taxpayer can pay the assessment within one year of the deadline to file the

protest, and then file a claim for refund within 450 days of deadline to file the protest.  N.J.S.A. 54:49-14(b).

An informal conference hearing resulting from the filing of a protest is handled by the Conference and Appeals Branch of the Division of Taxation.  N.J.A.C. 18:32-1.1.  If the protest and the hearing, if requested, does not resolve the matter, an appeal can be filed with the Tax Court.  N.J.S.A. 54:49-18(a).  The Director has affirmatively taken steps to encourage taxpayers to take advantage of the optional protest procedure rather than filing directly with the Tax Court.  The notice of assessment provided to the taxpayer has form language that states "[s]ince most matters can be resolved through the protest and hearing process (N.J.A.C. 18:32-1.1 et seq.), it is requested that taxpayers make use of this informal process."  Hearings are scheduled on a date mutually acceptable and whenever possible held by telephone.  N.J.A.C. 18:32-1.4.  A taxpayer may have an attorney or accountant present at a conference hearing.  N.J.A.C. 18:32-1.5.

The plain language of both the statute and regulation contemplate that the protest and the request for a hearing are separate and distinct.  The statute separately provides that the taxpayer may "file a protest . . . which shall set forth the reason therefor . . ., and may request a hearing."  N.J.S.A. 18:49-18(a). The regulation makes the distinction clear by stating "[a] protest, and a request for hearing, if any, by a taxpayer . . ."  N.J.A.C.

-9-

18:32-1.1 (section 1.1). The regulation further provides "[u]pon the timely filing of a protest and a request for hearing pursuant to N.J.A.C. 18:32-1.1, the hearing process shall be commenced with the submission of a written protest statement as defined by this section and a request for a hearing, if a hearing is desired." N.J.A.C. 18:32-1.2(a) (section 1.2). Reading this language closely, while section 1.1 only requires a generic protest, the submission of a "written protest statement as defined by [section 1.2]" is a prerequisite to the commencement of a hearing. Section 1.2 requires the submission of eight items including the payment of any taxes which are undisputed. The overall thrust of the eight submissions required by section 1.2 is to enable the Director to focus the inquiry in anticipation of the conference hearing.

The Director can delay the commencement of a conference hearing until compliance with the section 1.2 submissions. However, the Director cannot limit the taxpayer's further appeal rights in the Tax Court based upon the scope or breadth of the section 1.2 submissions. There is simply no statutory or regulatory authority for such a result. Both the statute and the regulation treat the protest separate and apart from the hearing. The section 1.2 submissions are simply a tool to help foster a productive conference hearing that may lead to a resolution.

The section 1.2 submissions are not intended to be a trap for the unwary that may be utilized later to destroy the appeal of a

claim in the Tax Court.  The Director has billed the process as informal.  If claims would be precluded based upon Section 1.2 submissions, seasoned tax practitioners may well discourage clients and their accountants from requesting conference hearings. This undercuts the Director's statements encouraging parties to take advantage of the informal conference hearing process in an effort to avoid litigation in Tax Court.

The court must decide whether the limitation imposed by the Director for the conference hearing carries over to this appeal before the Tax Court.  The taxpayer's accountant only indicated the desire to appeal on August 8, 2013 without further specification.  Technically, the taxpayer only filed a protest and did not request a hearing.  At that juncture, the Director was free to have the matter reviewed by the Conference and Appeals Branch and issue a decision based upon the information in the file. This is the same procedure that is followed in the event a taxpayer fails to appear at a hearing.  N.J.A.C. 18:32-1.4.

Instead of denying the conference hearing, the Director responded that it wanted the taxpayer to "perfect" the request in accordance with N.J.A.C. 18:1-1.8 and N.J.S.A. 54:49-18.[2]  Namely, the Director sought the eight section 1.2 submissions.  It is the

---

[2] Parenthetically, N.J.A.C. 18:1-1.8 was replaced with N.J.A.C. 18:32-1.1, 1.2, 1.4, 1.7, 1.8 in 2006.  38 N.J.R. 3316(b) (Aug. 21, 2006).

responses to these submissions that the Director relies for its argument that the Tax Court appeal is limited to only the "sales" tax and not the "use" tax.[3] These submissions were provided by taxpayer's accountant some six months after the deadline to request a conference hearing.

Even assuming that the Director's dichotomy between the "use" tax and the "sales" tax stands, the Director should have considered the "use" tax on the merits of the facts documented in the Director's file, and considered the "sales" tax on the merits of the facts documented in the Director's file and adduced at the conference hearing. The taxpayer only filed a protest, not a hearing request. The protest only generically indicates the taxpayer's desire to appeal. At the onset, moving this matter towards a conference hearing seemed to be a good faith attempt by the Director to utilize the process to resolve taxpayer disputes and should not be discouraged. However, to now use the hearing

---

[3] While it appears that the audit approach of the Director may be proper in this circumstance, calling the review of purchases from vendors a use tax audit may be a misnomer. The audit was not focused on out of state purchases being used in this state for which use tax would be due. N.J.S.A. 54:32B-6. Rather, the audit was of vendor transactions in which tax was not paid by taxpayer. The law clearly provides that a vendor collects the tax from the customer. N.J.S.A. 54:32B-12. Here, the customer is the taxpayer. If there is a failure of the customer to pay sales tax, it does not only mean that only the vendor is responsible for the tax, but the customer would have an obligation to pay as well. N.J.S.A. 54:32B-14(b). This is an independent obligation, distinct from that of the vendor, to pay sales tax.

process to curtail the scope of a Tax Court appeal is counter-productive to the goal of encouraging participation in this informal process. Based upon the foregoing, the section 1.2 submissions do not serve as basis to limit the scope of the appeal before the Tax Court.

B.   **The Challenge to the Use Tax Audit**.

As stated previously, the "use tax" audit consisted of the Director reviewing all vendor purchases for the year 2009 and flagging those purchases upon which the Director contends that a tax should have been paid, but was not. The Director determined that there were $3,481,561.00 in purchases and other expenses. Of these purchases and expenses, the Director identified some $72,832.46 or 2.09195% of the total for which tax was allegedly not paid. The Director then applied this percentage to the purchases and expenses for 2007 through 2010 which total $16,462,054.00. The product of multiplying the total by 2.09195% is $344,377.68. Multiplying this amount by the 7% tax rate results in the total tax due of $24,106.44.

The taxpayer's primary contention is that a number of vendor goods and services which were ultimately provided to schools were included on the Auditor's work papers as taxable. Specifically, a description for certain transactions clearly indicates the transactions were for schools. The record does not reveal, nor did the argument reveal, how the description on the work papers

was derived (i.e., was it based on information solely provided by the taxpayer, or was it based upon other information obtained or verified by the Auditor).

The law provides an exemption for vendor "[r]eceipts from sales made to contractors or repairmen of materials, supplies or services for exclusive use in erecting structures or building on, or otherwise improving, altering or repairing real property of . . . organizations described in [N.J.S.A. 54:32B-9(a),(b)] . . . that are exempt from the tax imposed under the 'Sales and Use Tax Act.'" N.J.S.A. 54:32B-8.22(a). Exempt organizations include political subdivisions. N.J.S.A. 54:32B-9(a)(1). There is not any serious dispute that if the vendor supplied goods and services that were indeed utilized for certain public schools operated by a local board of education, a political subdivision, said transactions would not be subject to tax just as if the school made the purchase directly from the vendor. See Stubaus v. Whitman, 339 N.J. Super. 38, 48 (App.Div. 2001)(local board of education is political subdivision). The dollar amount of the school transactions listed amount to nearly $7,500.00, which is about 10% of the transactions flagged in the Director's audit.

It is well settled that the Director's assessments are presumed to be correct. Yilmaz, Inc. v. Director, 390 N.J. Super. 435, 440, 23 N.J. Tax 361, 366 (App. Div. 2007). Atlantic City Transportation Co. v. Director, 12 N.J. 130, 146 (1953); L & L Oil

-14-

Service, Inc. v. Director, 340 N.J. Super 173, 183 (App. Div. 2001). "The presumption in favor of the taxing authority can be rebutted only by cogent evidence, a proposition that has been long settled. The strength of the presumption is exemplified by the nature of the evidence that is required to overcome it. That evidence must be definite, positive and certain in quality and quantity to overcome the presumption. . . It is clear that the presumption is not simply an evidentiary presumption serving only as a mechanism to allocate the burden of proof. It is, rather, a construct that expresses the view that in tax matters it is to be presumed that governmental authority has been exercised correctly and in accordance with the law." Pantasote Company v. City of Passaic, 100 N.J. 408, 413 (1985); see also, United Parcel Service General Services Co. v. Director, 25 N.J. Tax 1, 12-13 (Tax 2009).[4]

The above standard must be applied in relation to the framework of the applicable standard to be applied depending on the stage of the litigation. This matter comes before this Court on a motion for summary judgment filed by the Director. The taxpayer did not cross-move for summary judgment. A cross-motion may signal that the matter is ripe for adjudication short of a

---

[4] The Court is especially cautious with regard to challenges to audits of cash business. See, Yilmaz, Inc. v. Director, 390 N.J. Super. 435 (App. Div. 2007); Charley O's, Inc., t/a Scotty's Steakhouse v. Director, 23 N.J. Tax 171 (Tax 2006). However, this case does not involve the audit of a cash business. Nevertheless, the foregoing does provide guidance.

hearing with credibility determinations and the like. See Spring Creek Holding v. Shinnihon USA, Co., 399 N.J. Super. 158, 177 (App. Div. 2008). As is often stated, summary judgment provides a prompt business-like and appropriate method of disposing of litigation without the parties incurring the time and expense of a worthless trial. Brill v. The Guardian Life Insurance Company of America, 142 N.J. 520, 540-41 (1995). Summary judgment is also meant to prevent one party from using the threat of litigation, namely a trial, as a means to coerce a settlement. Id. at 541. The process as enunciated by the Brill Court is to sift through the competent evidentiary materials to determine if there is a material issue of fact that requires a trial on the merits. Id. at 539-540. At the summary judgment stage, it is impossible and also improper for the court to make credibility determinations. Id. at 540. Finally, all logical inferences that can be gleaned from the record must be resolved in favor of the non-moving party. Id.

The taxpayer does indeed have the burden of overcoming the presumption. As to the presumption, the court looks at the evidence of the non-moving party through rose-colored glasses. MSGW Real Estate Fund, LLC v. Borough of Mountain Lakes, 18 N.J. Tax 364, 379 (Tax 1998).

The issue here is the inclusion of the transactions as taxable which are clearly labeled in the description as pertaining to schools. The evidence presented does not reveal how this

-16-

description was derived.  At this stage in the litigation, the logical inferences must be given to the taxpayer opposing the Director's motion.  The most favorable inference in favor of the taxpayer is that the expenses were for school projects, yet through error or inadvertence, the auditor failed to remove the purchase from the list of taxable exceptions.  There are a number of other transactions that are listed for schools that have indeed been removed from the taxable exceptions column.  It is unclear at this point whether the failure to remove the transactions in question as taxable exceptions is the result of simple inadvertence, the taxpayer failing to present sufficient evidence to cause removal of an item or the outright refusal of the auditor to remove the item.  Since this is merely a motion for summary judgment, the designation of the transactions as being for schools without any explanation as to whether said descriptions have been rejected or accepted, leads to the most reasonable inference in favor of the taxpayer that the transactions are exempt, thus overcoming the presumption.

At trial, the taxpayer may not be able to rest upon the lack of clarity in the audit records if the Director is able to credibly clarify the school transaction notations.  In such case, the taxpayer may have to present evidence explaining these transactions with the necessary proofs such as tax exemption forms (i.e., Form ST-4) completed by a school district for a contractor,

-17-

or by other credible evidence establishing that the transactions are exempt.

    **C.**    <u>**The Challenge to the Sales Tax Audit**</u>.

For the "sales tax" portion of the audit, the auditor collected invoices from customers for the sample year 2009. The total invoices amounted to $2,735,265.00. Of these invoices, the auditor noted taxable exceptions upon which it has been alleged that tax was not paid. According to the auditor, these taxable exceptions amount to $95,432.58. Taking this amount and dividing by the previously mentioned $2,735,265.00, results in a taxable exemption percentage of 3.49%. Multiplying this by the total sales from 2007 through 2010 of $14,063,878.00, results in total taxable exceptions for the period of $490,729.00. Multiplying this amount by 7% results in a tax due of $34,358.03. The taxpayer now contends that of the $95,432.58 of sales for 2009 which were deemed taxable exceptions, $55,683.44 was attributable to Barefoot Landing, which is the familial shore home of the principal of taxpayer, Statewide Commercial Cleaning. Removing this amount from the calculation results in a taxable exception rate of 1.45% which would significantly reduce the tax liability for "sales tax" by half.

The Director argues that the taxpayer waited too long to challenge the agreed upon 2009 sample period, and is thereby bound to accept the inclusion of the Barefoot Landing job. On the other hand, the taxpayer argues that the inclusion of sales to Barefoot

Landing was a taxable one-time event not capable of repetition and thus should be excluded from the taxable exceptions for the extrapolation calculation. In the alternative, the taxpayer argues that the Barefoot Landing job was for non-taxable capital improvements and thus should not be part of the calculation. Finally, the taxpayer argues that the Barefoot Landing sales are not really sales, since both Barefoot Landing and Statewide Commercial Cleaning are closely held entities controlled by the same individual, and both reported on the same individual's income tax returns as a pass-through entity.

### 1. **Inclusion of Barefoot Landing**.

The Director here decided to conduct the audit utilizing block sampling. "Block sampling is the most common method utilized by field audit. Block sampling requires the auditor to examine all invoices (or receipts) for all transactions of a certain type that occurred during a selected period of time within the audit period, known as the 'sample period.'" St. of N.J., Dep't of the Treas., Div. of Tax'n, N.J. Manual of Audit Procedures, 41 (2017). "If taxable exceptions are found within the sample, the percentage of error for the sample period is extrapolated over the audit period. For example, the error rate calculated for the sample period will be applied to the total amount for the audit period (sales or expenses) to determine the taxable exceptions for the audit period." Id.

As set forth by the manual, "the auditor will prepare a sampling agreement which sets out the audit period and a sampling period for each tax and sub-type such as expenses or assets." Id. at 42. "The auditor will discuss the agreement with the taxpayer and/or the authorized representative and give them the opportunity to include in the sampling agreement any concerns or reservations with any aspect of the sampling plan and/or propose any alternatives." Id. It is contemplated that the agreement is in writing since the taxpayer is to sign the agreement and there is a procedure if the taxpayer refuses to sign. Id.

Moreover, the audit manual sets forth a safety valve in the event the auditor realizes that the original sampling plan needs to be modified. The auditor can prepare a new sampling agreement and present it to the taxpayer or the taxpayer's authorized representative with a memorandum that states the reasons why it is necessary to revise the original plan. The audit manual fails to indicate what is to be done in the event that the taxpayer realizes that the original sampling plan needs to be modified.

The Director argues that the taxpayer cannot challenge the agreed upon 2009 sampling plan. The Director has not produced any written sampling plan. It is also unclear when the taxpayer first raised the Barefoot Landing issue. Since this is a motion for summary judgment, the most favorable inference raised by the certification of taxpayer's accountant is that the issue was raised

-20-

while the audit was being conducted.  See Brill, supra, 142 N.J. at 540 (most favorable inference in favor of non-moving party). More importantly, though, the Barefoot Landing job was considered during the conference hearing and found to not be extraordinary. Thus, this is not the case where the taxpayer is raising the issue for the first time on appeal to the Tax Court.[5]  Since this issue was raised below with the Director, the court will consider the issue.

The Director's audit manual provides that "[a]n item is considered extraordinary or nonrecurring in nature if it is unusual and not routine in the normal course of taxpayer's business. Because it is nonrecurring, it may not be representative of the sample population.  The auditor should remove these items from the population and audit them separately.  The auditor should then examine the population to search for every occurrence of similar transactions which should also be pulled from the population and audited separately.  These items will be extrapolated separately." N.J. Manual of Audit Procedures, supra, at 42.  At least one other state that has an audit manual has considered this issue and reached a similar conclusion.

The California audit manual recognizes that non-recurring errors may become apparent while making a test of the taxpayer's

_____

[5] That is not to say the issue cannot be raised for the first time on appeal.  That issue is not before the court.

records.  St. of Cal., Dep't of Tax and Fee Admin., Bus. Tax and Fee Div., Audit Manual ¶ 0405.20(e) (Oct. 3, 2017).  In other words, these cannot be addressed in any sampling period agreement because they would not be discovered until the actual audit took place.  The manual indicates that non-recurring items are "normally items of considerable size, and the opposition to including them in the percentage of error is quite strong."  Id.  However, the purported non-recurring items "should be carefully scrutinized to determine whether or not they are non-recurring errors."  Id.

The New Jersey manual does not set forth any guideposts for determining when a non-recurring item should be excluded.  The California manual sets forth guideposts to determine if a transaction is a non-recurring error.  The first of those guideposts is that the size of the item is much in excess of the normal item and only occurs at rare intervals.  Id.  The second guidepost is that the item was omitted or included due to some unusual circumstance.  Id.  The third guidepost is that the item sold or purchased is of the type not normally handled.  Id.  However, the fact that a transaction was the only sale to a particular customer or purchase from a certain supplier should not be the sole criteria for eliminating the transaction from the test period.  These guideposts provide reasonable criteria to evaluate non-recurring errors.  There may be other guideposts the parties may want the court to consider in further proceedings.

The taxpayer's evidence must focus on the reasonableness of the underlying data used by the Director and the reasonableness of the methodology used. Charley O's, Inc., t/a Scotty's Steakhouse v. Director, supra, 23 N.J. Tax at 185. In Charley O's, the auditor increased the purchases by an arbitrary amount through a "plugged number" to conform the purchases with an unaudited Corporation Business Tax return. Id. at 176-177. The court determined that the presumption of correctness was overcome since the methodology was aberrant and not merely imperfect. Id. at 186.

As before, while the taxpayer does indeed have the burden of overcoming the presumption, the court looks at the evidence of the non-moving party through rose-colored glasses. MSGW Real Estate Fund, LLC, supra, 18 N.J. Tax at 379. On summary judgment, the court must sift through the evidence giving all factual inferences to the non-moving party.

The Director has not presented any fact or merit based evidence to challenge the exclusion of Barefoot Landing. Applying the three guideposts above does help clarify the issue. The Barefoot Landing sale is more than half of the audited taxable exceptions for the sample period. With a nonrecurring item of such considerable size, the opposition to inclusion is quite strong. Moreover, while the Barefoot Landing job was not included or excluded for some unusual factor, the sale was to a related

-23-

entity controlled by the same principal. This seems to be a sale outside the normal course of business. Sifting through the available evidence and giving all reasonable inferences to the taxpayer, leads to the conclusion that the Barefoot Landing job could be a non-recurring item thereby overcoming the presumption. Including such a large non-recurring transaction may not merely be imperfect, but aberrant.

At trial, the audit must stand upon a factual foundation which the taxpayer can attempt to topple. If the Director does not present any merit or fact based rationale for including the Barefoot Landing job, the Director's determination without any factual support may be insufficient to sustain the audit determination.

### 2. **Capital Improvements vs. Restoration**.

The taxpayer also claims that the work done to Barefoot Landing constitutes capital improvements rather than restoration work. Under the law, capital improvements would not be taxable, but restoration work would be taxable. Based upon the records submitted, and giving the most favorable inference to the taxpayer, it could be determined at trial that the work was a mix of capital improvements and restoration work. Without further testimony or evidence, the Court is unable to differentiate the two. Since an unknown reduction of the taxable amount would reduce the percentage

used for extrapolation and likewise reduce the amount of tax due by an unknown amount, this issue is not ripe for summary judgment.

### 3. **Pass through Entity**.

Taxpayer also argues that because Statewide Commercial Cleaning, LLC and Barefoot Landing are pass through entities owned by the same individual, no sales and use tax is due. A pass through entity is an income tax concept. See generally Miller v. Director, 352 N.J. Super. 98 (App. Div. 2002). This does not mean that the entities lose their separate legal status because of filing status. Rather, the income of these separate legal entities is aggregated with the other income of a principal shareholder or member of the entities. Id. at 104-105.

A taxpayer is free to arrange its affairs as it deems fit. "Once the taxpayer has chosen the corporate business form under which it intends to operate, the law must subsequently recognize that form despite any legal or tax consequences to the parties." L.B.D. Constr., Inc. v. Director, 8 N.J. Tax 338, 350 (Tax 1986). The taxpayer here "[h]aving chosen this method of owning property and conducting business in this State, it cannot now deny its existence in order to avoid the tax consequences. . ." Somerset Apts. v. Director, 134 N.J. Super 550, 555 (App. Div. 1975). The "administrative burden may well be too much if a state must explore the ramifications of corporate structures to determine the justice of recognizing or ignoring corporate entities in each factual

-25-

complex." Household Fin. Corp. v. Director, 36 N.J. 353, 363 (1962). For example, the transfer of an automobile, from the sole stockholder of a corporation to the corporation met the definition of a sale for sales tax liability. L.B.D. Constr., supra, 8 N.J. Tax at 346.

Taxpayer made a choice to create and operate the separate entities in this case. With that choice comes benefits and burdens. There is simply no basis in law to disregard these entities and treat the assets as directly owned by the principal of the entities.

## III. Conclusion

For the foregoing reasons, the Director's motion for summary judgment is denied.